## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. H-05-309 |
| | § | |
| ADONIS ANDREANO ABBOTT, | § | |
| *et al.* | § | |

## MEMORANDUM AND ORDER

Defendants Adonis Andreano Abbott, Anthony Joe Williams, Bralyonne Dontraill Rogers and Emanuel Burette Sutton are charged with armed bank robbery, in violation of 18 U.S.C. § 2113.[1]

Defendants have moved to suppress certain evidence against them [Docs. # 58, # 60 and # 73]. Each Defendant adopted and joined in the other Defendants' suppression motion and arguments made by all defense counsel at the December 21, 2005 evidentiary hearing. The Court has considered the motions, the Government's response [Doc. # 79], the evidence presented at the hearing, counsel's written and oral arguments, and the applicable legal authorities. The Court **denies** the motions to suppress.

---

[1] Defendants also are charged with aiding and abetting the robbery pursuant to 18 U.S.C. § 2.

I.   __FINDINGS OF FACT__

On June 23, 2005, at approximately 3:00 p.m., the Wells Fargo Bank located in a Randall's grocery store at 9660 Westheimer Road, Houston, Texas, was robbed. Three armed robbers stole $24,183.00, and escaped in a vehicle. Witnesses stated that the robbers were African-American males but, because the robbers wore ski masks and head coverings, the witnesses could not give more specific descriptions of the men.

In the bag of stolen cash were three electronic tracking devices ("ETDs") that, once undocked from their housings in the bank, emitted signals to satellites. The satellites then communicated the ETDs' location to the Houston Police Department ("HPD") through designated computers.

Defendants were arrested just before 3:30 p.m. the day of the robbery as they were driving two vehicles on Westheimer just east of South Post Oak Lane. Defendants challenge the stop of their vehicles, their arrests, and all evidence that was derived from the stop. Defendants complain that the police stops of their vehicles were without reasonable suspicion and violated their right under the Fourth Amendment of the United States Constitution to be free from unlawful seizures. The Government disagrees. The Government contends that the vehicle stops were lawful

and necessary steps in a fast-paced investigation, and that there was reasonable suspicion to investigate each of the vehicles specifically.

The Court credits the testimony of the three HPD officers who testified at the hearing:  Sgt. Gary Urie, an expert in HPD technology; Officer Scott Arnold, a fourteen year veteran of HPD; and Officer Juan Huezo, who has eight years HPD experience.  While the impressions or personal conclusions of the arresting officers (Arnold and Huezo) differed in some respects, these disparities do not undermine the key parts of their testimony and the impressions they formed as events on June 23, 2005 unfolded.

The evidence establishes the following: At approximately 3:10 p.m. on June 23, 2005, three men robbed the Wells Fargo Bank branch in the Randall's grocery store, located at 9660 Westheimer (just east of S. Gessner Road).  Witnesses contacted HPD just after 3:10 p.m.  The witnesses could only give a vague description of the robbers whom they described as three "Black men" wearing ski masks and head coverings. The robbers were armed.  They were described as wearing variously dark shirt and pants, and a red shirt.  They took the money in what looked like a black bag.  The only car that was seen and associated with the robbers was a silver car and/or a green Dodge.

HPD immediately sent out requests by radio for police assistance.  Officer Arnold responded by going to the parking lot of the store, but other officers had already arrived and were inside.  As Officer Arnold was waiting for further instructions, he noticed a silver car behind the bank with a large plume of black smoke coming out of it.  He then learned the car had been "torched."[2]  Officer Arnold continued to listen to the police radio for further instructions and leads to investigate.  He switched at some point to the channel specially designated for the robbery investigation ("channel 5").  When he learned from the HPD dispatcher that the robbers were traveling east along Westheimer, he joined the chase.  There was some discussion on the police radio that the robbers might be in a green Dodge.

Prior to June 23, the bank had installed electronic tracking devices (ETDs) leased or purchased from a private company, 3SI.  The ETDs are designed to serve as global positioning units if separated from their docking stations.  Each ETD transmits a signal to six or seven satellites that collectively calibrate the ETD's location.  The satellites forward the information to HPD through computers in an HPD headquarters office.[3]  Trained dispatchers orally describe the movement of the

---

[2]      The police Event Summary (GX 5, at first page of exhibit, marked "2" in upper right corner) states that the silver car had been stolen, used as a getaway car, and then burned.  Then the "suspects got into 2 other cars and fled."

[3]      The witness explained that when the ETD is detached from its docking station, it emits a
(continued...)

ETD over the police radio to aid police officers in the field, who proceed to investigate "on the ground" at the recommended locations.  The accuracy of an ETD varies depending on the number of satellites that can pick up the ETD's signal.  It appears that the signals gave location information accurate to within approximately 70 to 100 feet.  Sgt. Urie is an experienced user of the ETD technology, having tested it, been trained on its use, and having trained others.  He has used the ETDs on three investigations.  The evidence shows that the ETDs operated as designed.

From approximately one minute after the robbery until Defendants were arrested, the ETDs gave the police strong indications of the location of the stolen cash.  With a very limited exception, the ETDs were moving together, suggesting the money was still in a single bag.  Signals revealed the money was moving east on Westheimer, at varying paces.  Officer Arnold drove east on Westheimer.  He soon learned that he was about two or three blocks behind the transmitters.  The eastbound traffic became very heavy on Westheimer as the cars approached the Galleria shopping mall.[4]

---

[3]        (...continued)
        signal to the satellites.  The satellites' signals are downloaded to computers which calibrate the device's location and send the information to the HPD computers to aid police investigations.  The information is delayed approximately six seconds, but the time lag is immaterial in this case.

[4]        The Galleria is located on the south side of Westheimer, starting several hundred feet west
(continued...)

Officer Arnold then heard the dispatcher state that the three ETD transmitters were either stationary or were moving very slowly, possibly as if they were being carried by someone walking.  The dispatcher's reports varied but ultimately stated that the ETDs were moving generally eastward[5] very slowly and that they stopped periodically.  This information suggested to the officers on Westheimer that at least one (if not all) of the robbers was with the money in a vehicle caught in the heavy traffic on Westheimer heading east.[6]

Officer Arnold and others spontaneously decided to block all eastbound traffic on Westheimer at South Post Oak Blvd.[7]   Officer Huezo blocked the two southernmost lanes (labeled for purposes of the hearing, respectively, "Lane 3" and "Lane 4") with his patrol car and another officer did the same for the two northern lanes ("Lanes 1 and 2," respectively).  The officers' goal was to conduct a brief

---

[4]      (...continued)
of the intersection of Westheimer and McCue (a north-south street that dead-ends into Westheimer) and continuing to the intersection of Post Oak Boulevard and Westheimer.

[5]      At one point the dispatcher said that "they" were going north, but shortly thereafter stated they were moving east.

[6]      The dispatcher said at one point that "they" were going north on McCue, and then west on Westheimer.  It appears that in fact the car with the bag and ETDs may have shifted lanes. At one point the transmitter shows a curved path just north of Westheimer, near Sage. However, this has not been shown to be material.

[7]      Officer Arnold passed the stopped traffic by crossing the median and going east in the westbound lane, which was not crowded.

search for anything suspicious consistent with the limited descriptions of the robbers, bag, and car(s).  By this time, there were at least eight to ten officers in the immediate vicinity of Westheimer and Post Oak Blvd. working on the investigation.  The officers' presence was open and obvious.  Their parked patrol cars had the police lights flashing.  All the police officers had their guns drawn and visible (at the "low ready").  There was a canine officer with a barking police dog and an officer with a rifle.  Several of the officers were walking west, with guns drawn for officer safety, between the lanes of stopped traffic, starting at Post Oak Blvd.  The officers were looking for people (pedestrians or in vehicles) with a black bag similar to what the robbery witnesses had described.  The officers also were searching for a car – possibly a four-door Ford, possibly green, with a license plate number containing possibly "266."

Understandably, most people in the lanes of traffic were excited, upset and/or at least surprised by the extraordinary activity.  The travelers generally were watching the officers, presumably to avoid possible gun fire, if not for other reasons.  As soon as the traffic was stopped, Officer Arnold began to walk westbound between Lanes 1 and 2 on Westheimer.  He noticed that all the people in the cars were excited, some were on cell phones, some were yelling or talking.  Many looked panicked, frightened or concerned.  All were interested in what was transpiring.

Within a minute or minute and a half of starting his survey of the stopped cars, Officer Arnold spotted a bright red Chevrolet sports utility vehicle ("SUV"), which he thought was "real nice."  It was the fourth vehicle from the intersection in Lane 3. Officer Arnold then noticed that the driver, an African-American male, was staring calmly straight ahead not watching any of the activity.  The officer did not stop, however.  It appeared to the officer that the driver was oddly placid and collected, as if he were trying to appear unconcerned about what the police were doing.  As Officer Arnold passed the driver, he saw that there was another African-American man in the passenger seat.  Officer Arnold then looked at Officer Huezo, who had just passed the rear end of the SUV and was a few steps ahead (west) walking between Lanes 3 and 4.  As Officer Huezo walked by the SUV, he noticed that the driver was an African-American male looking straight ahead, and that the front seat passenger, also an African-American male, was holding his cell phone in his right hand partially shielding his face, was slumped down in the seat, and was looking straight ahead. The passenger did not turn his head to follow Officer Huezo, but watched the officer in the side view mirror.  Officer Huezo thought the passenger's behavior odd.  The officer then noticed a third African-American male sitting in the back seat of the SUV.  Thinking the conduct combined with the group of individuals, collectively, was suspicious given the description of the robbers, Officer Huezo concluded the

occupants in the SUV required further investigation.  Officer Huezo therefore pointed to the vehicle and mouthed the words, "This is it."  Officer Arnold saw the signal, stepped across Lane 2 and asked the SUV's driver to get out of the car.  When the driver opened the door and got out, Officer Arnold saw a black or very dark colored bag, with cash sticking out, on the floorboard just in front of the driver's seat.  Officer Arnold then directed the driver, Defendant Abbott, to sit on the median and placed him under arrest.

Meanwhile, Officer Huezo continued west.  He spotted two women trying to leave their car in Lane 4 to go into the Galleria parking lot.  He ordered them back to their car for their safety.  As he did so, he noticed that a four-door Ford immediately behind the SUV had a license plate with "66" in the number.  As Officer Huezo pointed to that car, the driver, also an African-American male (Defendant Williams), got out and tried to run away.  Officer Arnold, as he approached the Ford's open driver door, saw a stack of currency on the floor just in front of the driver's seat. Other officers then converged on the Ford and apprehended Williams almost immediately.[8]  The passengers in the SUV also were arrested.

Additional factual details found by the Court will be noted as necessary in the analysis that follows.

---

[8]    Williams had a gun and wore a bullet-proof vest when arrested.

## II.    CONCLUSIONS OF LAW

Defendants move to suppress the evidence obtained from them and their cars after the police stopped all eastbound traffic on Westheimer.  Defendants argue that the traffic stop and the officers' investigation of them individually violated their right under the Fourth Amendment of the United States Constitution to be free from unlawful seizures.  Defendants contend that there was no reasonable suspicion based on articulable facts to justify questioning or investigating Abbott, his passengers, or Williams, citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968).  Defendants contend that the police decided to investigate them solely because they were three African-Americans, and that such a race-based decision is unconstitutional. The Government defends the stop of traffic and Defendants' vehicles, as well as the particular investigation of Defendants individually, as lawful.  The Government argues that the HPD officers had a valid basis to stop all the traffic on Westheimer and to conduct a further investigation of Defendants based on their appearance (including their race) and specific aspects of Defendants' behavior.

### A.    Overview - Fourth Amendment Principles and Investigative and Traffic Stops

"There are three recognized types of encounters between law enforcement officers and citizens, including:  (1) a consensual encounter during which an

individual voluntarily agrees to communicate with the police; (2) a limited investigatory stop based upon less than probable cause [pursuant to *Terry v. Ohio*]; and (3) an arrest which constitutes a seizure under the Fourth Amendment." *United States v. Williams*, 365 F.3d 399, 403-404 (5th Cir. 2004) (citing *United States v. Cooper,* 43 F.3d 140, 145-46 (5th Cir. 1995)).   A non-consensual search without a warrant is justified if exigent circumstances exist.   *United States v. Jones*, 239 F.3d 716, 719 (5th Cir. 2001).

A routine traffic stop is a "seizure" for Fourth Amendment purposes and under *Terry v. Ohio*, 392 U.S. 1 (1968).   *United States v. Edmond*, 531 U.S. 32, 40 (2000); *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (*en banc*).   An investigative stop pursuant to *Terry v. Ohio* requires that the officer have "reasonable suspicion," a standard which is "considerably easier for the government to establish than probable cause." *United States v. Tellez*, 11 F.3d 530, 532 (5th Cir. 1993) (citing *United States v. Wangler*, 987 F.2d 228, 230 (5th Cir. 1993)).   To satisfy the "reasonable suspicion" standard, the officer "must be able to point to *specific* and *articulabl*e facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21 (emphasis added); *accord United States v. Sokolow*, 490 U.S. 1, 2 (1989); *Delaware v. Prouse*, 440 U.S. 648, 654-55 (1979).   Reasonable suspicion "need not be based merely on personal

observation," but can be based upon other information with sufficient "indicia of reliability." *Tellez*, 11 F.3d at 532 (citing *Wangler*, 987 F.2d at 230).

The United States Supreme Court has stated that the analysis of data relevant to the existence of a reasonable suspicion which justifies a stop "does not deal with hard certainties, but with probabilities," and the evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez*, 449 U.S. 411, 412, 418 (1981). "The prosecution must demonstrate a 'minimal level of objective justification for the officer's actions, measured in light of the totality of the circumstances.'" *Tellez*, 11 F.3d at 532 (quoting *Wangler*, 987 F.2d at 230). When considered together, several otherwise innocent activities may "amount to reasonable suspicion." *Sokolow*, 490 U.S. at 9; *see also United States v. Chavez-Villarreal*, 3 F.3d 124, 126-27 (5th Cir. 1993) ("[w]e assess the basis for a stop not by isolating any component factor, each of which may indicate wholly innocent behavior standing alone, but by examining the entire picture, which must yield articulable and objective manifestations of particularized suspicion"). Further, a court may consider the investigating agents' law enforcement experience, particularly with reference to the specific type of crime involved in the case before the court. *See, e.g., United States v. Gonzales*, 79 F.3d 413, 422 (5th Cir. 1996).

"In evaluating the reasonableness of an investigatory *Terry* stop, this court must consider: 1) whether the officer's action was justified at its inception; and 2) whether it was reasonably related in scope to the circumstances that justified the interference in the first place." *Williams*, 365 F.3d at 405 (citing *Terry,* 392 U.S. at 19-20 (quotations omitted)); *accord Brigham*, 382 F.3d at 506.   The facts and circumstances of each case must be considered, "giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances." *Brigham*, 382 F.3d at 507. "[A] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Hayes v. Florida*, 470 U.S. 811, 816 (1985) (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)). "[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information." *Id.* (citations omitted).

A *Terry* stop, since it is not grounded on probable cause, warrants a temporary seizure only "for the purpose of questioning limited to the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 498 (1983) (plurality opinion) (citing *United States*

*v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975)).  The Court must take a common sense approach to evaluating the reasonableness of the investigation based on the specific facts of the case and will not engage in second guessing.

As to traffic stops, the Fifth Circuit has refused "to prescribe in the abstract the scope of questioning, investigative techniques, or length of permissible detention that may be undertaken following a valid traffic stop.  The bounds of existing case law are clear, if fact-intensive:  a traffic detention may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop."  *Brigham*, 382 F.3d at 512.

Police roadblocks raise a unique circumstance that must be considered in this case.  The United States Supreme Court held unconstitutional police drug interdiction checkpoints at which police officers stopped every car, demanded drivers licenses and registrations, peered into car windows, and led drug sniffing dogs around the vehicles because the tactic was indistinguishable from the city's general interest in crime control.  *See City of Indianapolis v. Edmond*, 531 U.S. 32, 41, 44 (2000).  The Supreme Court held that the stop in *Edmond* was made without individualized suspicion and "in the absence of special circumstances," was forbidden by the Fourth Amendment.  *Id.* at 44.  *Edmond* did not, however, prohibit "every 'law enforcement'

objective." *Illinois v. Lidster*, 540 U.S. 419, 424 (2004) (quoting and discussing *Edmond*, 531 U.S. at 44 n.1).

Indeed, in *Lidster*, the Supreme Court held that a police checkpoint at which all motorists were systematically stopped to enable police to seek information about a fatal hit-and-run accident at that location on the highway about a week earlier and to hand each driver a flyer requesting assistance in identifying the vehicle and driver involved in the accident did not violate the Fourth Amendment rights of a motorist arrested at the stop for driving under the influence of alcohol. *Lidster*, 540 U.S. at 424. The Supreme Court further held the stop was reasonable given the public concern, the degree to which the stop advanced that concern, and the length of the stop. *Id.* at 427. The public concern was great, the stop was reasonably calculated to advance the investigation, and the intrusion in each individual's freedom was minimal because the wait in line lasted only a few minutes at most. *Id.*

## B.   **Analysis**

### 1.    **Propriety of the Roadblock**

The Supreme Court in *Edmond* stated "[t]he Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up to . . . catch a dangerous

criminal who is likely to flee by way of a particular route." *Edmond*, 531 U.S. at 44. This kind of circumstance was present in *Lidster*. *See Lidster*, 540 U.S. at 422.[9]

HPD created the roadblock on Westheimer to address a highly unusual circumstance, namely, to locate potentially dangerous armed criminals and their stolen property. The police had narrowed the likely geographic location of the suspects and the stolen money. The case therefore fits within the *Edmond* rule that a roadblock checkpoint carefully addressing a specific law enforcement need would not violate the Fourth Amendment. The roadblock was not "primarily for general 'crime control' purposes, *i.e.,* 'to detect evidence of ordinary criminal wrongdoing,'" as in *Edmond*. The Court concludes on the facts of this case that the HPD roadblock was a targeted law enforcement effort not comparable to the "stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that *any given motorist has committed some crime*." *Lidster*, 540 U.S. at 424 (citing *Edmond*, 531 U.S. at 44) (emphasis added by *Lidster* court). Apt is the comment by the Court in *Lidster* that an "*Edmond*-type rule of automatic unconstitutionality" should not apply to "brief, information-seeking highway stops."

---

[9]     The Court recognizes that HPD's roadblock was not solely "investigatory" to ascertain information to "help apprehend, not the vehicle's occupants, but other individuals," as in *Lidster*. *See Lidster*, 540 U.S. at 423. This distinction, however, is one without a difference.

*Lidster*, 540 U.S. at 424.  "[T]he fact that such stops normally lack individualized suspicion cannot by itself determine the constitutional outcome." *Id.* "The Fourth Amendment does not treat a motorist's car as his castle." *Id.* (citing *New York v. Class,* 475 U.S. 106, 112-113 (1986); *United States v. Martinez-Fuerte,* 428 U.S. 543, 561 (1976)).  "[S]pecial law enforcement concerns will sometimes justify highway stops without individualized suspicion." *Id.* (citing *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444 (1990) (sobriety checkpoint); *Martinez-Fuerte,* 428 U.S. at 561 (border patrol checkpoint)).

Furthermore, the roadblock involved only a very brief "seizure" of Defendants' and other vehicles.  The cars were stopped for only a minute or two before Officer Arnold spotted Abbott and decided that he and the others in the SUV were of interest. That vehicle and Williams's car were fourth and fifth in the line from the front of the roadblock.[10]  Just as in *Lidster*, a roadblock on a busy city street – set up to locate stolen money with the aid of an ETD – is a very rare occurrence.  *See id.* at 426 ("Finally, we do not believe that an *Edmond*-type rule is needed to prevent an unreasonable proliferation of police checkpoints).  "Practical considerations –

---

[10]     The officers did not question Defendants or even ask Abbott to exit his vehicle until the officers had sufficient articulable facts to meet the reasonable suspicion test.  Similarly, the officers did not initially question or even engage the other Defendants.

namely, limited police resources and community hostility to related traffic tie-ups –

seem likely to inhibit any such proliferation." *Id.* (citations omitted).

The Court turns from the Fourth Amendment generic analysis to a discussion

of the reasonableness of the roadblock in issue.  For reasons similar to those

discussed above, the roadblock involving Defendants' vehicles was reasonable.  The

public concern was grave.  There had been an armed bank robbery several miles

away, and the police had strong scientific evidence from the three ETDs that the

stolen money was within a hundred feet of the ETDs' signals.  The robbers had one

or more guns and were on the loose.  The fact that the ETDs were moving slowly

together, stopping and starting, on Westheimer indicated that at least one of the

robbers and the money was on Westheimer heading to the freeway (Loop 610) at rush

hour.  Creating a roadblock to stop the vehicle in this location was within the officers'

investigative discretion.

Additionally, the stop interfered only minimally with Defendants' liberty until

Defendants exited their cars and the police spotted the cash.  The vehicles were

stopped for a minute or two before the police targeted Defendant Abbott and his

passengers as suspects worthy of further investigation.  While the roadblock was a

dramatic police tactic, it was not unreasonable under all the circumstances.

Defendants' contrary arguments are rejected.

### 2.    Reasonable Suspicion Analysis

Defendants contend that the police had no reasonable suspicion to focus on them individually, and that the police used race as the only – or at least the predominant – factor to target Defendants for further investigation.  Defendants assert that the use of their race as a basis for the inquiry is unconstitutional.  The Court is unpersuaded that the premise of Defendants' argument is correct, and thus rejects Defendants' conclusion.  The Court concludes that the police had sufficient articulable facts on which to base a reasonable suspicion.  Each Defendant's race, while considered as a relevant fact because of the witnesses' descriptions, was not the only basis for the decision to make further inquiry.

The Court must defer to the experience of law enforcement officers and consider the evidence as understood by those "versed in the field of law enforcement," "not in terms of library analysis by scholars" after the fact.  *See Cortez*, 449 U.S. at 412, 418; *Tellez*, 11 F.3d at 532 ("The prosecution must demonstrate a 'minimal level of objective justification for the officer's actions, measured in light of the totality of the circumstances.'" (quoting *Wangler*, 987 F.2d at 230)).  Each of the investigating officers had years of police experience.  There is no evidence that the officers had any racial bias or animus against African-Americans.

The facts known to the officers and their personal collective observations constitute reasonable suspicion sufficient to initiate investigation of the occupants of the SUV driven by Abbott.  The officers' opinions that Abbott and his front seat passenger acted in a suspicious manner has grounding in the credible evidence.  First, Officer Arnold, having noticed Abbott's bright red car for innocent reasons, *i.e.*, the officer admired it as "real nice," observed that Abbott did not look at the officers swarming around the vehicles with guns drawn.  Rather, Abbott appeared inappropriately calm and disinterested.  The Court agrees that such behavior was unusual given the extraordinary overall police activity in the area.

Officer Huezo observed that the front passenger in that same vehicle acted inconsistent with the officer's perception of ordinary behavior because the passenger was trying to hide his face and to slump low in the seat apparently to avoid attention. In addition, Officer Huezo noticed that there were three African-American men together in the vehicle, another telling fact, in light of the bank witnesses' reports about the robbers.   While certain of the conduct on which the officers relied might be considered by some as innocent behavior, there were sufficient articulable facts observed by experienced law enforcement officers to constitute particularized suspicion justifying the questioning of Abbott.

Defendants argue that the fact that the three men were together and were all African-American should not be sufficient.  Defendants point out that the men could have separated, and the police did not have any information about the location of the robbers.  They urge that all the police knew was that the three ETDs (and thus at least some of the stolen money) were in the vicinity.  Defendants contend that the police relied on the suspects being African-American, that such a characteristic is an impermissible factor, and it should not be sufficient to warrant further questioning of an individual.  These arguments are not persuasive because they ignore crucial probative evidence in the record.  It was reasonable for investigative purposes for the police to assume that the three robbers still were together.  Less than 20 minutes had elapsed from the time the robbery was reported in progress.  One car that may have been the get-away vehicle had been destroyed.  It was logical that the robbers would have a second vehicle available as a means of escape.  Moreover, the money was taken in one bag, and all indications were that the cash had not yet been divided.  It could be expected that the robbers all wanted to remain with the cash.

Finally, the race of the three robbers is clearly a relevant – indeed, crucial – piece of information upon which the police could rely.  The police were entitled to consider the witnesses' identifying information about the robbers, *i.e.*, that each was an African-American male, as sparse as this information was.  While it might have

been improper for police to question a single person in the roadblock merely because of his race – a circumstance the Court does not reach –, law enforcement officers were entitled to consider suspicious the fact that there were three people riding together who collectively matched the witnesses' race and gender descriptions, when the three were in the precise location where the stolen cash was reasonably thought to be.  The information on the location of the cash was stronger than usual because that information was based on proven, reliable technology, not merely subjective police hunches without objective support.

Moreover, these factors are not all the police relied on.  The three men's location, race and gender were coupled with the perceived suspicious conduct of two of the three men.  The police accordingly had sufficient articulable facts to support reasonable suspicion to believe criminal activity by the occupants of the SUV was afoot.  The police had more than "a minimal level of objective justification for the stop" and inquiry of Abbott.  *See United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005).  The motions of Abbott, Sutton and Rogers to suppress evidence of their stop, the succeeding detentions, and the arrests, as well as the alleged fruits of these events are without merit and are denied.

The events surrounding the identification of Williams's car, both before and after Abbott was arrested, also are ample to establish reasonable suspicion for the

police to question and arrest Williams.  Williams was driving a four-door Ford with a license plate containing two digits "66" that matched a partial plate number given by a witness.  When Officer Huezo pointed the license plate or car out to another officer, Williams (the driver) got out of the car, leaving the door open.  Williams is an African-American male, matching the description of the robbers.  His decision to leave and run away from his car could reasonably to viewed by the officers as suspicious.  This was adequate information for police to stop and question him for officer and public safety reasons, let alone to advance the investigation.[11]  However, once Williams opened the door, the stack of money on the floorboard in front of the driver's seat was visible to any passerby.  The cash was in plain view, was obviously unusual, and provided reasonable suspicion for the police to question Williams. Williams's motion to suppress is denied.

III.    **CONCLUSION**

For the foregoing reasons, the Court holds that the Government has established that neither the roadblock nor the officers' conduct towards Defendants individually violated Defendant's Fourth Amendment rights.  It is therefore

**ORDERED** that Defendants' Motions to Suppress Evidence [Docs. # 58, #60, and # 73] are **DENIED**.

---

[11]

Signed at Houston, Texas this 30th day of December, 2005

Nancy F. Atlas
United States District Judge